UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARIAM BARRY,<br><br>       Plaintiff,<br><br>    v.<br><br>THE CITY OF NEW YORK and NEW YORK CITY HEALTH AND HOSPITALS,<br><br>       Defendants. | ECF CASE<br><br>No.: _____<br><br><br>COMPLAINT<br><br>JURY TRIAL DEMANDED |

Plaintiff Mariam Barry, through her attorneys, Lipsky Lowe LLP, alleges as follows:

PRELIMINARY STATEMENT

Defendants' employees targeted and harassed Plaintiff Barry because she is a practicing Muslim, including spraying her food with Lysol and calling her a "nasty Muslim." Defendants were aware of this. Defendants did nothing. Plaintiff Barry suffered because of Defendants' inaction: the very same employees who she complained about threw hot water on her face and then ripped off her hijab. The very next day after Plaintiff reported the assault to police, Defendants placed her on unpaid suspension and ultimately terminated her.

NATURE OF THE ACTION

1.      Plaintiff Mariam Barry worked for Defendants the City of New York ("NYC") and New York City Health and Hospitals ("NYCHHC") from June 27, 2022, until her termination and/or constructive discharge, as a Behavioral Health Associate ("BHA"). Throughout her tenure as a BHA, Defendants subjected Plaintiff to severe and pervasive harassment on the basis of her religion, national origin, ethnicity, and weight. Despite Plaintiff's repeated and well-documented formal and informal complaints of such harassment, Defendants plainly failed to intervene and protect her. As a result of Defendants' negligence, Plaintiff was battered and assaulted in a

1

religiously and ethnically motivated attack. Worse yet, after Plaintiff endured this preventable assault, Defendants terminated her.

2.     As such, Plaintiff brings this action asserting claims of discrimination, hostile work environment, and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII"), the New York State Human Rights Law ("NYSHRL"), New York City Human Rights Law ("NYCHRL"), and the New York State common law, and seeks damages to redress the injuries she has suffered as a result of being discriminated against and subjected to a hostile work environment on the basis of her religion, national origin, ethnicity, and weight, and retaliated against for her engagement in one or more protected activities.

## JURISDICTION, VENUE, AND PROCEDURAL PREREQUISITES

3.     Jurisdiction of this Court is proper under 28 U.S.C. §§ 1331 and 1343 as this action arises under 42 U.S.C. § 2000e, et seq.

4.     The Court has supplemental jurisdiction over the claims that Plaintiff has brought under State and City law pursuant to 28 U.S.C. § 1367.

5.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) as Defendants reside within the Southern District of New York, and/or the acts complained of occurred therein.

6.      By: (a) timely filing a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on November 4, 2025; (b) receiving a Notice of Right to Sue from the EEOC on April 24, 2026; (c) commencing this action within 90 days of the issuance of the Notice of Right to Sue by the EEOC and (d) contemporaneously with the filing of this Complaint, mailing a copy thereof to the New York City Commission of Human Rights ("NYCCHR") and the Office of the Corporation Counsel of the City of New York pursuant to the notice requirements of § 8-502 of the New York City Administrative Code, Plaintiff has satisfied

all of the procedural prerequisites for the commencement of the instant action. A copy of the Notice of Right to Sue is annexed hereto as Exhibit A.

PARTIES

7.      At all relevant times herein mentioned, Plaintiff was an adult individual residing in Bronx County, New York.

8.      At all relevant times herein mentioned, Plaintiff was and is a Muslim female of West African descent, who immigrated to the United States from her home country of Guinea.

9.      At all relevant times herein mentioned, Defendant NYC was and is a municipal corporation, located within the State of New York. Pursuant to Chapter 16 § 396 of the Charter of the City of New York, all actions against the agencies or elected officers of the City shall be brought in the name of the City.

10.      At all relevant times herein mentioned, Defendant NYCHHC is a municipal corporation duly organized and existing under the laws of the State of New York with its principal place of business located at 50 Water Street, New York, New York 10004. NYCHHC operates the public hospitals and clinics in New York City. NYCHHC owned, operated, maintained, managed, and controlled a hospital facility known as NYC Health + Hospital/Metropolitan (the "Hospital"), located at 1901 First Avenue, New York, NY 10029.

11.      At all relevant times herein mentioned, Plaintiff is an "employee" and "person," and Defendants are "employers" under the statutes pursuant to which Plaintiff proceeds hereunder.

12.      At all relevant times herein mentioned, Defendants NYC and NYCHHC are referred to collectively as "Defendants."

13.      At all relevant times herein mentioned, Defendants employed 15 or more employees.

3

STATEMENT OF FACTS

14.     On or about June 26, 2022, Defendants hired Plaintiff as a Personal Care Assistant ("PCA") earning approximately $22.50 per hour, or $47,000 per year, and working approximately 40 hours per week at the Hospital.

15.     Approximately one year later, in or around 2023, Plaintiff was offered the position of BHA, earning approximately $30 per hour, and working on average 56 hours per week. As such, Plaintiff typically worked sixteen (16) hours of overtime at a rate of $45 per hour.

16.     In total, Plaintiff earned approximately $80,000 per year including overtime before her unlawful suspension and termination.

17.     As a BHA, Plaintiff's primary responsibilities included socializing with patients, ensuring they were served and ate meals, and maintaining clean and orderly patient care and common areas.

18.     At all relevant times herein mentioned, Plaintiff was supervised by Director of Nursing Karen Mohammed ("Mohammed") and Head Nurse Habi Moses-Kabba ("Moses-Kabba").

19.     As such, Director Mohammed and Head Nurse Moses-Kabba possessed supervisory authority over Plaintiff, and had the power to hire, fire, discipline, or otherwise affect the terms and conditions of Plaintiff's employment.

20.     Throughout her tenure with Defendants, Plaintiff had a generally positive performance record, with no previous disciplinary write-ups or charges brought against her.

21.     In her role as a BHA, Plaintiff worked in close physical proximity to other BHAs, including Lamenca Holder ("Holder") and Regina Todd ("Todd").

4

Plaintiff Is Subjected to Discriminatory Harassment[1]

22.     Starting in or around December of 2024, Todd and Holder began subjecting Plaintiff to repeated discriminatory remarks, including repeated instances of bullying and targeted harassment on the basis of Plaintiff's religion, ethnicity, national origin, and weight.

23.     By way of example, Plaintiff typically ate her lunch in the employee lounge area. At times, Plaintiff's lunches consisted of foods which are part of her cultural and ethnic background.

24.     When Plaintiff brought lunches that they perceived as unappealing, Holder and Todd made discriminatory and demeaning comments about Plaintiff's lunch, loudly stating that it smelled bad.

25.     On some occasions, the smell bothered Holder and Todd to such a degree that Todd sprayed Plaintiff's lunch food with Lysol cleaning product – creating the risk of chemical poisoning to Plaintiff that could result in grievous bodily harm. Todd's use of chemical spray constitutes common law battery.

26.     Besides battering and nearly poisoning Plaintiff over the smell of her food, Holder and Todd also followed Plaintiff around on her lunch break on numerous occasions, mocking Plaintiff's weight and calling her "fatso."

27.     Throughout winter of 2024 and into 2025, Holder and Todd continued to harass and demean Plaintiff publicly. During some of these altercations, Todd and Holder physically threatened Plaintiff, suggesting that Plaintiff "meet [them] outside" after work hours to fight.

28.     During the same time period, including up to and through Plaintiff's suspension, Todd and Holder repeatedly made derogatory comments to Plaintiff, including "you fucking

---

[1] These section headers are included for organizational purposes only.

African" and calling Plaintiff a "nasty Muslim." These comments were often accompanied by threats similar to those described above, including inviting Plaintiff to meet Holder and Todd outside to fight.

29. Holder and Todd also made repeated attempts to sabotage Plaintiff's work and performance.

30. By way of example, on or about March 14, 2025, Plaintiff went to the bathroom and overheard Holder falsely state to Head Nurse Moses-Kabba that Plaintiff had left work for the day and went home early.

31. Plaintiff immediately exited the bathroom and requested an explanation as to why Holder lied to Head Nurse Moses-Kabba. Holder responded by feigning confusion, claiming that she genuinely thought Plaintiff had left and that she was just "jealous."

32. In addition to the March 14, 2025, incident, Holder and Todd routinely falsely accused Plaintiff of leaving work without permission to Head Nurse Moses-Kabba.

33. Further examples of Holder and Todd's sabotage included accusing Plaintiff of failing to adequately care for her one-on-one patients.

34. Generally, one-on-one sessions refer to a task in which Plaintiff or other BHAs assisted patients by helping them socialize, eat, and maintain their hygiene.

35. On one occasion, Plaintiff finished up a session with her one-on-one patient and released him from her supervision. Several hours after the end of Plaintiff's session with the patient, the patient soiled himself.

36. When Holder and Todd realized the patient soiled himself, they falsely accused Plaintiff of not cleaning the patient – despite knowing that the patient was clean at the time Plaintiff ended her one-on-one session.

37.     Holder and Todd's false accusations were motivated by their invidious animus against Plaintiff's religion, ethnicity, and national origin, and were made in an attempt to interfere with the terms and conditions of her employment.

38.     On or about March 18, 2025, Plaintiff and Holder were both getting lunch for their one-on-one patients in the lunch area of the Hospital.

39.     On this particular occasion, one of Plaintiff's patients would not come get their lunch tray, and as a result, Plaintiff placed the tray on a chair so she could continue serving another patient.

40.     When Plaintiff did so, Holder became upset that Plaintiff left the tray on the chair and began yelling at her to "meet outside to fight." Holder then continued to follow Plaintiff around on her lunch break stating to Plaintiff, in sum and substance, "everybody talking about your name here . . . so if you want to keep your job close your mouth fucking nasty Muslim."

Plaintiff Formally Complains of Discrimination

41.     In or around late March of 2025, Plaintiff approached Supervisor Sudre Barnabas ("Barnabas") in his office at the Hospital to verbally complain of Holder and Todd's discriminatory behavior and harassment.

42.     As Plaintiff's Supervisor, Barnabas possessed supervisory authority over Plaintiff, and had the power to hire, fire, discipline, or otherwise affect the terms and conditions of her employment.

43.     Plaintiff specifically complained to Supervisor Barnabas that Holder and Todd subjected her to repeated and increasingly severe episodes of harassment on the basis of Plaintiff's national origin, ethnicity, weight, and religion, detailing what had happened. In response to

Plaintiff's complaint, Supervisor Barnabas assured Plaintiff that he would speak to Holder and Todd.

44.    Despite Plaintiff's good faith attempt to resolve the hostile work environment by complaining to her supervisor, Holder and Todd continued to harass Plaintiff on the basis of her religion, national origin, ethnicity, and weight.

Defendants Fail to Remediate the Hostile Work Environment

45.    On or about April 8, 2025, Plaintiff sent Director Mohammed, Supervisor Barnabas, and Belinda Medina ("Medina") an email complaint regarding Todd and Holder's continued discriminatory behavior.

46.    On or about April 11, 2025, Plaintiff filled out and submitted a physical formal complaint form with Defendants' internal Office of Equal Employment Opportunity ("EEO").

47.    Plaintiff further indicated that she had previously reported Todd and Holder's discriminatory behavior to her supervisors; however, no remedial action was taken against Todd and Holder, and their behavior persisted.

48.    In her complaint form, Plaintiff wrote that Holder and Todd subjected Plaintiff to numerous instances of discriminatory harassment, including making physical threats towards Plaintiff, attempting to sabotage her job, and calling her a "fucking nasty Muslim" and "fucking African."

49.    Notwithstanding Plaintiff's April 8, 2025, and April 11, 2025, complaints of unlawful discrimination to Defendants, Holder and Todd continued to harass her.

50.    For example, on or about April 14, 2025, Holder demeaned and degraded Plaintiff by referring to her as "dum dum."

51.    Later that same day, Plaintiff informed Head Nurse Moses-Kabba that she intended to seek guidance with her union regarding Holder and Todd's ongoing harassment.

52.    Head Nurse Moses-Kabba then told Plaintiff to request Holder to wait for her in the hallway, which Plaintiff did. When Plaintiff approached Holder to share Head Nurse Moses-Kabba's directive, Holder responded in an intimidating manner stating, "you can meet me outside of the job too."

53.    Holder's clear and unambiguous threat of physical violence put Plaintiff in immediate apprehension of imminent bodily harm and greatly distressed her.

<u>Defendants' Failure to Act Culminates in a Violent Discriminatory Assault</u>

54.    As a result of Holder's latest threat, Plaintiff emailed Medina a follow-up complaint highlighting Holder's threats of physical harm and demeaning comments.

55.    Plaintiff further stated that "despite previous reports" she was experiencing "ongoing issue of workplace bullying," a "troubling pattern of behavior" that "remain[ed] unresolved," and that she was "fearful for [her] life."

56.    Defendants' unreasonable and negligent failure to address Plaintiff's complaints against Todd and Holder resulted in Plaintiff becoming the victim of a hate crime at the hands of her harassers.

57.    On or about July 1, 2025, Plaintiff took a break in order to pray as part of her typical religious worship practices.

58.    After prayer, Plaintiff went to the employee lounge to eat lunch. At that time, Plaintiff placed a cup of water into the microwave to warm it. Shortly thereafter, Holder entered the kitchen area, opened the microwave door while the microwave was running, and threw the cup of hot water onto Plaintiff.

59.     Holder's physical attack on Plaintiff caused her serious injury, put Plaintiff in immediate apprehension of further bodily harm, and greatly distressed her.

60.     Holder then lunged at Plaintiff, ripping off her hijab before pulling Plaintiff to the floor to continue assaulting her.

61.     During the assault, Holder made repeated discriminatory and disparaging remarks regarding Plaintiff's ethnicity and religion. As such, Holder's actions were motivated by unlawful discriminatory animus.

62.     After the assault, Plaintiff immediately filed a police report with the New York City Hospital Police Department ("NYCHPD"), indicating that after she finished her mid-day prayer, Holder assaulted Plaintiff by throwing hot water on her and attacking her unprovoked.

63.     That day, Plaintiff received a letter from Senior Director of Labor Relations for Defendants Tonya Morgan ("Morgan") titled "PRE-HEARING SUSPENSION NOTICE," notifying Plaintiff that effective July 2, 2025, she would be placed on unpaid leave – despite being the victim of a discriminatory and targeted physical assault.

64.     On or about July 25, 2025, Senior Director Morgan sent a document to Plaintiff titled "NOTICE AND STATEMENT OF CHARGES."

65.     This notice advised Plaintiff that disciplinary charges would be brought against her for "[engaging] in a physical altercation with co-worker, [Holder]."

66.     Senior Director Morgan's letter further advised Plaintiff that a step I grievance hearing would be held on August 4, 2025, at which time a determination would be made as to the merits of the charges against Plaintiff as well as the respective discipline if such charges are substantiated.

67.     On or about August 4, 2025, Plaintiff attended the step I hearing, at which time a determination issued that Plaintiff engaged in the July 1, 2025, physical altercation with Holder in violation of Defendants' policies.

68.     That same day, and as a result of the Step I determination, Plaintiff drafted and sent an email complaint of discrimination to Senior Vice President and Co-Chair of Defendants' Equity and Access Council, Natalia Cineas ("Cineas"), highlighting the repeated and unremedied Islamophobic rhetoric in the workplace which culminated in a physical assault.

69.     Plaintiff's letter complaint read, in relevant part:

> "My name is Mariam Barry BHA, I've been working at Metropolitan Hospital Behavior Health, Unit 8 West, my head nurse is habi kaba and my ADN is Sudre Barnabas and my director being Ms. Mohamed. I am writing this letter this evening to bring your attention to a cyclical and ongoing issue that has been obstructing my ability to work properly at my job, but an even bigger issue and problem that has been forced onto me that is physically, mentally, and emotionally draining. The problem has been the product of the actions of two of my colleagues, Ms. Todd BHA and Ms. Holder PCA. These two started their antics of constantly bothering and harassing me since 2024. I am a practicing Muslim, so this was a focus of their bullying remarks to me to try and use against me, trying to make fun of my religion, which included making [I]slamophobic remarks at me, cursing and yelling at me unprovoked, calling me out, and telling me to go 'fight about it' outside after hours . . . [a]n investigation would be greatly appreciated and welcome with the other staff to uncover the truth[.] I've constantly vocalized and brought my concerns to my Head Nurse and my director alongside my union, all verbally with writing to them both and my Union, and my Director to back all of this up. I even have an [internal] case set up against my director."

70.     Plaintiff went on to complain that, as a result of Defendants' patent refusal to address Plaintiff's complaints, Plaintiff was assaulted and battered by Holder, an individual who has demonstrated clear animus towards Plaintiff's religion. Worse yet, Plaintiff highlighted that

despite being the victim of Holder's bigoted and hate-fueled assault, Plaintiff was placed on indefinite unpaid leave.

71.    Plaintiff finished her letter complaint by pleading with Defendants to investigate and take appropriate remedial action against Holder.

72.    On or about August 13, 2025, Senior Director Morgan sent Plaintiff a letter regarding the outcome of her August 4, 2025, step I hearing. According to the letter, Senior Director Morgan allegedly substantiated Plaintiff's role in the altercation with Holder.

73.    Despite acknowledging in her letter that there were "no witnesses" and that Management was aware of Plaintiff's previous complaints against Holder, Senior Director Morgan issued a recommendation that Plaintiff be suspended.

74.    On or about September 2, 2025, Senior Director Morgan sent Plaintiff another letter escalating the August 13, 2025, recommendation of suspension to a recommendation of termination, and further advising Plaintiff that if she did not appeal the step I decision to step II by September 17, 2025, she would be terminated the following day.

<u>Defendant Attempts to Resolve Plaintiff's Union Grievance and Reverse Her Termination</u>

75.    On or about September 4, 2025, Plaintiff emailed Senior Director Morgan and the Labor Relations department, stating "To whom it may concern. Yes, I'd like to appeal to get my job back because I love what I do, I felt like [I] was bullied and harassed after what I've been through."

76.    On October 17, 2025, Plaintiff appeared for a Step II hearing as part of the grievance procedure to contest her unpaid suspension.

77.    In or around February 2026, Defendants and Plaintiff's union presented her with a grievance settlement agreement, which would have required, among other things, that Plaintiff

accept a probationary period. This agreement also included a general waiver of rights. Plaintiff did not sign this agreement.

78.    As such, Plaintiff was terminated effective September 2, 2025 – the day termination was recommended as a result of the Step I decision.

79.    In the alternative, Plaintiff was constructively discharged on or about March 3, 2026, the day she refused to sign the grievance settlement agreement, as signing the settlement agreement would have eviscerated Plaintiff's legal rights with respect to this matter. As such, Plaintiff felt reasonably compelled to refuse to do so and resigned.

80.    Defendants subjected Plaintiff to unlawful discrimination on the basis of her religion, national origin, ethnicity, and weight.

81.    Defendants retaliated against Plaintiff for engaging in one or more protected activities.

82.    Defendants treated Plaintiff differently, solely due to her religion, ethnicity, national origin, and weight.

83.    Defendants are liable for the discriminatory conduct of their employee agents Todd and Holder, whose discriminatory animus affected Plaintiff's ultimate termination.

84.    Defendants knew or should have known that Plaintiff was discriminated against and subjected to a hostile work environment on the basis of her religion and/or national origin, which culminated in serious bodily harm against Plaintiff.

85.    Plaintiff has been unlawfully discriminated against, humiliated, degraded, and belittled, and as a result, suffered violation of her rights, emotional distress, loss of back pay, front pay, and benefits, special damages, legal fees/costs, loss of enjoyment of life, economic hardship, and emotional and physical pain and suffering.

86. Defendants' conduct has been malicious and willful, outrageous, and conducted with full knowledge of the law.

FIRST CAUSE OF ACTION
DISCRIMINATION AND HOSTILE WORK ENVIRONMENT
UNDER TITLE VII

87. Plaintiff repeats and realleges each allegation of the preceding paragraphs as if fully set forth herein.

88. Title VII prohibits discrimination based on religion, ethnicity, and national origin and the creation of a hostile work environment. 42 U.S.C. §§ 2000e-2(a) et seq.

89. Defendants discriminated against Plaintiff and subjected her to a hostile work environment based on her religion, ethnicity, and national origin, through a pattern of offensive, abusive, and biased conduct, including by making derogatory statements about Muslims such as referring to Plaintiff as a "Nasty Muslim" or "Fucking African(s)," physically attacking Plaintiff in a bigoted and discriminatory assault and battery, by frequently demeaning, belittling, and otherwise verbally mistreating Plaintiff due to her religion, ethnicity, and national origin; and by suspending Plaintiff without pay and terminating her due to the false and pretextual allegations by her attacker, Holder.

90. Defendants' discriminatory conduct was severe and pervasive, creating a hostile work environment that materially altered the terms and conditions of Plaintiff's employment.

SECOND CAUSE OF ACTION
RETALIATION UNDER TITLE VII

91. Plaintiff repeats and realleges each allegation of the preceding paragraphs as if fully set forth herein.

92. Title VII provides that it shall be an unlawful employment practice for an employer to discriminate against any of its employees because she has opposed any practice made an

14

unlawful employment practice by this subchapter, or because she has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter. 42 U.S.C. § 2000e-3(a).

93.    Defendants engaged in unlawful employment practices prohibited by Title VII by discriminating against Plaintiff with respect to the terms, conditions, or privileges of her employment because of her opposition to the unlawful employment practices of Defendants.

94.    Plaintiff engaged in protected activity under Title VII when she: (a) verbally complained to Supervisor Barnabas in late March 2025 of religious, national-origin, and ethnic harassment by Holder and Todd; (b) emailed Director Mohammed, Supervisor Barnabas, and Medina on April 8, 2025, complaining of the same harassment; (c) submitted a formal written complaint to Defendants' internal EEO office on April 11, 2025; (d) sent a follow-up complaint to Medina after Holder's April 14, 2025, threat; (e) filed a police report with NYCHPD on July 1, 2025, immediately after Holder's violent assault; (f) sent a written complaint of religious discrimination to Senior Vice President Cineas on August 4, 2025; and (g) filed a Charge of Discrimination with the EEOC on November 4, 2025.

95.    Defendants took materially adverse actions against Plaintiff that would dissuade a reasonable employee from making or supporting a charge of discrimination, including: (a) failing to investigate or remediate her complaints, permitting the harassment to continue and escalate into physical assault; (b) placing Plaintiff on unpaid "pre-hearing" suspension effective July 2, 2025 — the very day after Plaintiff filed her police report against Holder; (c) charging Plaintiff with engaging in a "physical altercation" for which Defendants' own internal investigation acknowledged there were "no witnesses"; (d) escalating, on September 2, 2025 — less than one month after Plaintiff's August 4, 2025, written complaint to SVP Cineas — the disciplinary

15

recommendation from suspension to termination; and (e) ultimately terminating Plaintiff's employment.

96.     A causal connection exists between Plaintiff's protected activities and the adverse actions, as evidenced by, among other things, the close temporal proximity between the protected activities and the adverse actions (most strikingly, the one-day interval between Plaintiff's July 1, 2025, police report and her July 2, 2025, suspension), the absence of any legitimate basis for the adverse actions, and Defendants' reliance on the false and pretextual accusations of Plaintiff's attacker. Plaintiff's protected activities were the but-for causes of the adverse actions taken against her.

<u>THIRD CAUSE OF ACTION</u>
DISCRIMINATION AND HOSTILE WORK ENVIRONMENT
UNDER THE NYSHRL

97.     Plaintiff repeats and realleges each allegation of the preceding paragraphs as if fully set forth herein.

98.     Executive Law § 296 provides that:

> It shall be an unlawful discriminatory practice: (a) For an employer or licensing agency, because of an individual's age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, marital status, or domestic violence victim status, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.

99.     Defendants discriminated against Plaintiff and subjected her to a hostile work environment based on her religion, ethnicity, and national origin, through a pattern of offensive, abusive, and biased conduct, including by making derogatory statements about Muslims such as referring to Plaintiff as a "Nasty Muslim" or "Fucking African(s)," physically attacking Plaintiff in a bigoted and discriminatory assault and battery, by frequently demeaning, belittling, and

16

otherwise verbally mistreating Plaintiff due to her religion, ethnicity, and national origin; and by suspending Plaintiff without pay and terminating her due to the false and pretextual allegations by her attacker, Holder.

100.    Defendants' discriminatory conduct was severe and pervasive, creating a hostile work environment that materially altered the terms and conditions of Plaintiff's employment.

FOURTH CAUSE OF ACTION<br>RETALIATION UNDER THE NYSHRL

101.    Plaintiff repeats and realleges each allegation of the preceding paragraphs as if fully set forth herein.

102.    Executive Law § 296(7) provides that:

> "It shall be an unlawful discriminatory practice for any person engaged in any activity to which this section applies to retaliate or discriminate against any person because he or she has opposed any practices forbidden under this article or because he or she has filed a complaint, testified or assisted in any proceeding under this article."

103.    Defendants engaged in unlawful employment practices prohibited by the NYSHRL by discriminating against Plaintiff with respect to the terms, conditions, or privileges of her employment because of her opposition to the unlawful employment practices of Defendants.

104.    Plaintiff engaged in protected activity under the NYSHRL by opposing practices forbidden under the NYSHRL and by filing complaints regarding the same, including: (a) her late-March 2025 verbal complaint to Supervisor Barnabas; (b) her April 8, 2025, email complaint to Director Mohammed, Supervisor Barnabas, and Medina; (c) her April 11, 2025, formal complaint to Defendants' internal EEO office; (d) her follow-up email complaint to Medina; (e) her July 1, 2025, police report regarding Holder's assault; (f) her August 4, 2025, written complaint to SVP Cineas; and (g) her November 4, 2025, EEOC Charge.

105.    In retaliation for Plaintiff's protected activity, Defendants subjected Plaintiff to adverse actions that would deter a reasonable employee from engaging in protected activity, including failing to investigate or remediate her complaints, suspending her without pay one day after her July 1, 2025, police report, escalating the disciplinary recommendation from suspension to termination within a month of her August 4, 2025, complaint to SVP Cineas, and ultimately terminating her employment. Plaintiff's protected activity was a motivating factor in Defendants' adverse actions.

106.    A causal connection exists between Plaintiff's protected activities and the adverse actions, as evidenced by, among other things, the close temporal proximity between the protected activities and the adverse actions (most strikingly, the one-day interval between Plaintiff's July 1, 2025, police report and her July 2, 2025, suspension), the absence of any legitimate basis for the adverse actions, and Defendants' reliance on the false and pretextual accusations of Plaintiff's attacker. Plaintiff's protected activities were the but-for causes of the adverse actions taken against her.

## FIFTH CAUSE OF ACTION
### DISCRIMINATION AND HOSTILE WORK ENVIRONMENT
### UNDER THE NYCHRL

107.    Plaintiff repeats and realleges each allegation of the preceding paragraphs as if fully set forth herein.

108.    The New York City Administrative Code § 8-107(1)(a) provides that:

> It shall be an unlawful discriminatory practice for an employer or an employee or agent thereof, because of the actual or perceived creed, color, national origin, or weight of any person, to discriminate against such person in compensation or in terms, conditions or privileges of employment.

18

109.    Defendants discriminated against Plaintiff and subjected her to a hostile work environment based on her religion, ethnicity, national origin, and weight, through a pattern of offensive, abusive, and biased conduct, including by making derogatory statements about Muslims such as referring to Plaintiff as a "Nasty Muslim," "Fucking African(s)," or "fatso," physically attacking Plaintiff in a bigoted and discriminatory assault and battery, by frequently demeaning, belittling, and otherwise verbally mistreating Plaintiff due to her religion, ethnicity, national origin, and weight; and by suspending Plaintiff without pay and terminating her due to the false and pretextual allegations by her attacker, Holder.

110.    Defendants' discriminatory conduct was severe and pervasive, creating a hostile work environment that materially altered the terms and conditions of Plaintiff's employment.

SIXTH CAUSE OF ACTION
RETALIATION UNDER THE NYCHRL

111.    Plaintiff repeats and realleges each allegation of the preceding paragraphs as if fully set forth herein.

112.    The New York City Administrative Code § 8-107(7) provides that it shall be unlawful discriminatory practice: "For an employer . . . to discriminate against any person because such person has opposed any practices forbidden under this chapter. . ."

113.    Defendants engaged in an unlawful discriminatory practice prohibited by the NYCHRL by discriminating against Plaintiff with respect to the terms, conditions, or privileges of her employment because of her opposition to the unlawful employment practices of Defendants.

114.    Plaintiff engaged in protected activity under the NYCHRL by opposing practices forbidden under the NYCHRL, including her late-March 2025 verbal complaint to Supervisor Barnabas, her April 8, 2025, email complaint, her April 11, 2025, EEO complaint, her follow-up

19

complaint to Medina, her July 1, 2025, police report, her August 4, 2025, complaint to SVP Cineas, and her November 4, 2025, EEOC Charge.

115.    As a result of Plaintiff's protected activity, Defendants engaged in conduct reasonably likely to deter a person from engaging in protected activity, including by failing to investigate or remediate Plaintiff's complaints, by suspending her without pay one day after her July 1, 2025, police report, by escalating the disciplinary recommendation from suspension to termination within a month of her August 4, 2025, complaint to SVP Cineas, and by ultimately terminating her. Plaintiff's protected activity was at least a partial and motivating factor in Defendants' adverse actions.

116.    A causal connection exists between Plaintiff's protected activities and the adverse actions, as evidenced by, among other things, the close temporal proximity between the protected activities and the adverse actions (most strikingly, the one-day interval between Plaintiff's July 1, 2025, police report and her July 2, 2025, suspension), the absence of any legitimate basis for the adverse actions, and Defendants' reliance on the false and pretextual accusations of Plaintiff's attacker. Plaintiff's protected activities were the but-for causes of the adverse actions taken against her.

JURY DEMAND

117.    Plaintiff requests a jury trial on all issues to be tried.

WHEREFORE, Plaintiff respectfully requests a judgment against Defendants:

a.    Declaring that Defendants participated in unlawful employment practices prohibited by Title VII, the NYSHRL, and the NYCHRL in that Defendants discriminated against Plaintiff on the basis of her religion, national origin, ethnicity, and weight, and subjected her to a

20

hostile work environment, and retaliated against her for engaging in one or more protected activities.

b.      Awarding damages to Plaintiff for all lost wages and benefits resulting from Defendants' unlawful conduct, and otherwise make her whole for any losses suffered as a result of such unlawful employment practices;

c.      Awarding Plaintiff compensatory damages for mental, emotional and physical injury, distress, pain and suffering and injury to her reputation in an amount to be proven;

d.      Awarding Plaintiff attorneys' fees, costs, disbursements, and expenses incurred in the prosecution of the action;

e.      Awarding Plaintiff such other and further relief as the Court may deem equitable, just, and proper to remedy Defendants' unlawful employment practices.

Dated: New York, New York
       June 1, 2026

LIPSKY LOWE LLP

 s/Douglas B. Lipsky
Douglas B. Lipsky
Blake L. Ferris
420 Lexington Avenue, Suite 1830
New York, New York 10170-1830
Tel.: 212.392.4772
doug@lipskylowe.com
blake@lipskylowe.com
*Attorneys for Plaintiff*

21